## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**DIANNE BOTTINO**
*Individually, and as the*
*Personal Representative of the*
*Estate of Richard E. Hall*
209 Reed Road
Absecon, NJ 08201

            *Plaintiff,*

v.

**HOWARD COUNTY, MARYLAND**
SERVE: Calvin Ball,
*County Executive*
George Howard Building
3430 Court House Dr
Ellicott City, MD 21043

and

**WARDEN/DIRECTOR**
**MARGARET M. CHIPPENDALE**
*In Her Official Capacity as Director/Warden*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**WARDEN/DIRECTOR JAMA ACUFF**
*In Her Individual and Official Capacity as*
*Director/Warden*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER ANDREA KING-WESSELS**
*Howard County Detention Center*
*Correctional Officer/Deputy Director*
Corrections
7301 Waterloo Road

Case No: _____

**\*Jury Trial Demanded\***

Jessup, MD 20794

and

**OFFICER RORY WISE**
*Howard County Detention Center Correctional*
*Officer/Security Chief*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER ELIZABETH JENKINS**
*Howard County Detention Center*
*Correctional Officer/Lieutenant*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER BRIANA TUBAYA**
*Howard County Detention Center*
*Correctional Officer*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER ONEIL PATTERSON**
*Howard County Detention Center Correctional*
*Officer/Corporal*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER JEFFERY PENN**
*Howard County Detention Center Correctional*
*Officer/Corporal*
Corrections
7301 Waterloo Road
                    Jessup, MD 20794

and

**OFFICER KIM WILSON**
*Howard County Detention Center*
*Correctional Officer/Captain*
Corrections
7301 Waterloo Road
Jessup, MD 20794

and

**OFFICER GREGORY WRIGHT**
*Howard County Detention Center*
*Correctional Officer*
Corrections
7301 Waterloo Road
Jessup, MD 20794

> *Defendants.*

<u>**COMPLAINT AND JURY DEMAND**</u>

COMES NOW Plaintiff, Dianne Bottino, individually and *as the Personal Representative of the Estate of Richard E. Hall*, by and through attorneys Cary J. Hansel, Kristen M. Mack, and the law firm of Hansel Law, PC, and sues Defendants, Howard County, Maryland, Warden/Director Margaret M. Chippendale, Warden/Director Jama Acuff,  Officer/Deputy Director Andrea King-Wessels, Officer Rory Wise, Officer Elizabeth Jenkins, Officer Briana Tubaya, Officer Oneil Patterson, Officer Jeffery Penn, Officer Kim Wilson, and Officer Gregory Wright, and as cause therefore states the following:

<u>**INTRODUCTION**</u>

1.     This action is brought by Plaintiff, Dianne Bottino, as a result of the preventable and tragic death of Richard E. Hall (hereinafter "Decedent" or "Mr. Hall") while he was a

pretrial detainee in the custody of the Howard County Department of Corrections (hereinafter

"DOC") at the Howard County Detention Center (hereinafter "HCDC").

    2.      Mr. Hall was housed in cell #001 of the Central Booking Facility (hereinafter

"CBF") at HCDC, as it was determined through HCDC's intake screening process that Mr. Hall

was suffering from some serious mental health issues.  In an extreme display of indifference to

human life, HCDC employees idly stood by for an almost two-week period of time and watched

as Mr. Hall decompensated and died without ever giving him any of the necessary medical care

that Mr. Hall had a constitutional right to.

    3.      Mr. Hall's death was caused by the deliberate indifference, unreasonableness, and

negligence or gross negligence of the correctional staff at HCDC employed by Howard County.

## JURISDICTION AND VENUE

    4.      Jurisdiction is proper in this Honorable Court under 28 U.S.C. Code § 1331

because this is a civil action arising under the Constitution, laws, or treaties of the United States.

Plaintiffs further invoke supplemental jurisdiction of this Court to hear and decide claims arising

under state law, by virtue of 28 U.S.C. § 1367.

    5.      Venue is proper in this Honorable Court under 28 U.S.C. §1391 because the

parties are domiciled in Maryland, or organized under Maryland Law, and the events at issue

took place in Howard County, Maryland.

    6.      Plaintiff provided notice of the nature of his claim on August 13, 2021, in

compliance with the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc., § 5-

304(b) and (c), and all conditions precedent for the filing of this lawsuit have been met.

## PARTIES

7.    Plaintiff Dianne Bottino (hereinafter "Plaintiff Bottino" or "Ms. Bottino"), individually and *as the Personal Representative of the Estate of Richard E. Hall*, is a surviving sister of Mr. Hall, and was, at all times relevant to the occurrence complained of herein, an adult citizen of Maryland. Plaintiff Bottino brings this action individually and in her capacity as the personal representative of Decedent's estate. Decedent was an adult citizen of Maryland. He was not married and had no children.

8.    Defendant Howard County, Maryland (hereinafter "Defendant County") is an entity of local government of the State of Maryland that, by virtue of the Maryland Constitution and the Howard County Charter, is a body corporate and politic which may sue and be sued. Howard County owns, and through its DOC, operates the HCDC. Howard County was responsible for the policies, practices, customs, and regulations governing and used at HCDC and for the misconduct, acts, and omissions of its employees, agents, or servants.

9.    Defendant Margaret M. Chippendale (hereinafter "Defendant Chippendale") is an adult citizen of the United States and currently serves as the Director of the DOC and Warden/Director of the HCDC, and who stands in the shoes of all of her predecessors for the purposes of this case, whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law. Defendant Chippendale had the capacity and authority to hire, fire, and supervise final policy makers, including all individually named Defendants herein.

10.    Defendant Jama Acuff (hereinafter "Defendant Acuff") is an adult citizen of the United States and at all times relevant hereto was the Director of the DOC and Warden/Director of the HCDC whose conduct referred to herein was at all times relevant to her employment, and

who was responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.  Defendant Acuff had the capacity and authority to hire, fire, and supervise final policy makers, including all individually named Defendants herein.

11.     Defendant Officer/ Deputy Director Andrea King-Wessels (hereinafter "Defendant King-Wessels") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer and the Deputy Director for the HCDC whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of  misconduct discussed herein and was at all times relevant hereto acting under color of state law.

12.     Defendant Officer/ Security Chief Rory Wise (hereinafter "Defendant Wise") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer and the Security Chief for the HCDC whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of  misconduct discussed herein and was at all times relevant hereto acting under color of state law.

13.     Defendant Officer/ Lieutenant Elizabeth Jenkins (hereinafter "Defendant Jenkins") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of  misconduct discussed herein and was at all times relevant hereto acting under color of state law.

14.     Defendant Officer Briana Tubaya (hereinafter "Defendant Tubaya") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to her employment, and who is

responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

15.     Defendant Officer/ Corporal Oneil Patterson (hereinafter "Defendant Patterson") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

16.     Defendant Officer/ Corporal Jeffery Penn (hereinafter "Defendant Penn") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

17.     Defendant Officer/ Captain Kim Wilson (hereinafter "Defendant Wilson") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

18.     Defendant Officer Gregory Wright (hereinafter "Defendant Wright") is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the HCDC whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

19.     All other unidentified HCDC Correctional Officers whose conduct is referred to herein were at all times relevant hereto employed by HCDC, and who are responsible for the pattern and practice of misconduct discussed herein and were at all times relevant hereto acting under color of state law.

20.     Officers Andrea King-Wessels, Rory Wise, Elizabeth Jenkins, Briana Tubaya, Oneil Patterson, Jeffery Penn, Kim Wilson, and Gregory Wright, along with additional unidentified officers, are hereinafter collectively referred to as "Defendant Officers."

21.     All Defendants are jointly and severally liable for damages and injuries to the Plaintiff described herein.

## FACTS COMMON TO ALL COUNTS

22.     At the time of the incident, Mr. Hall was a 49-year-old man and a resident of Maryland.  He had never been arrested and he did not have a criminal record.  Before the incident described herein, he was in good health and did not have any significant medical issues. He was gainfully employed by TPM Group as an Assistant Project Manager.  He went to work on Thursday, May 6, 2021, as scheduled with his employer, and no one noticed anything unusual.  After working a full day, he left the office.

23.     A little after 4:00 a.m. on Friday morning, May 7, 2021, a man from the bar and restaurant Triple Nine Billiards Bar at 7540 Washington Boulevard in Elkridge, Maryland, called 911/Howard County Police, requesting that they remove a "crazy guy" at the "back door [who] was causing problems."

24.     The caller stated that the man, who turned out to be Mr. Hall, was "banging on the door," and "being crazy, screaming in people's faces and everything else."  The operator asked whether the man was "intoxicated," to which the caller definitively replied that the man to be

removed was "crazy," not drunk, and he asked that officers come to the location and remove him from the property.

25.    Howard County Police Officers David Skoglund (hereinafter "Officer Skoglund") and Kaitlyn Delph (hereinafter "Officer Delph") reported to the location.  Upon arrival, they observed Mr. Hall acting erratically, throwing his belongings about in the parking lot, rambling and speaking nonsensically.  The owner of the bar and restaurant confirmed that Mr. Hall was not drunk, he had consumed one beer and some food, and that he needed to be removed from the premises.

26.    Mr. Hall refused to leave and then proceeded to pull down his pants and underwear, yelling at the two officers, stating that he would not leave but that he was not going to jail either.

27.    During this entire interaction, Mr. Hall was either talking to himself or to some other imaginary person.  He was making statements that made no sense, repeatedly saying things like "do you believe me now," and "you have no idea."  When asked to leave the parking lot, it appeared that Mr. Hall did not know where he was, as he asked, "what parking lot," and "what is 999s."

28.    Instead of calling for assistance for an individual suffering from a mental health crisis, which was obvious based on the information that they received, their own observations, and from reports of his minimal alcohol consumption, Officers Skoglund and Delph arrested, searched, and transported Mr. Hall to HCDC, where he was booked around 4:45 a.m.

29.    Mr. Hall was charged with Indecent Exposure, Trespass: Private Property, and Disorderly Conduct.  All of these were non-violent misdemeanors, but he was held without bail.

His Booking Sheet stated: "Mental Health Alert." The Howard County Department of

Corrections' Record of Confinement provided an alert of "Intoxicated" for Mr. Hall.

30.     Mr. Hall was placed in a CBF cell and was placed on 30-minute welfare checks

due to his severely deteriorated mental and physical state. However, because of how bad HCDC

staff acknowledged Mr. Hall was doing mentally and physically, HCDC staff were actually

conducting 15-minute checks on him.

31.     On May 8, 2021, the very next day, Defendant Patterson noted that Mr. Hall was

"crazy" suffering from a "severe mental health problem." Defendant Patterson also noted that

Mr. Hall was "speak[ing] to [him]self and wall," and had a "temp."

32.     Mr. Hall was initially committed until the following Monday, May 10, 2021, until

11:00 a.m. "because of incompetence."

33.     Nothing indicates that there was contact with Mr. Hall by HCDC personnel on

Sunday, May 9.

34.     On May 10, 2021, as part of HCDC's initial risk screening, Brenda Fischel, LCPC

(hereinafter "Counselor Fischel") observed Mr. Hall in his cell and noted that Mr. Hall was

disorganized, belligerent, agitated, and was hallucinating. A recommendation was made to keep

him in the suicide watch cell with observations every 30 minutes. The hearing that was

scheduled for that day did not move forward because of Mr. Hall's incompetency.

35.     The following morning, on May 11, 2021, Mr. Hall had a virtual bail review in

front of Judge Marcy Reese. Bail was denied because of Mr. Hall's obvious incompetency. A

competency hearing was set for May 21, 2021. The Order for Commitment noted that Mr. Hall

did not know where he was located, spoke irrationally, and could not comport himself in a

manner that was appropriate for a bail hearing.

36.     By now, a co-worker of Mr. Hall had contacted Mr. Hall's sister, Dianne Bottino, who began to search for her brother.  She was able to locate Mr. Hall at HCDC, and she spoke with Corporal Small at HCDC.  Corporal Small confirmed that Mr. Hall was detained and that he was acting strangely.

37.     From this day forward until the day that Mr. Hall died, Ms. Bottino spoke with someone at HCDC every day, multiple times a day, voicing her concerns about her brother's well-being.

38.     Despite her repeated pleas, Ms. Bottino was not allowed to speak with Mr. Hall, was not allowed to see him—either in person or via remote means—and she was not allowed to visit him.  Ms. Bottino advised HCDC of the medications that Mr. Hall was taking, and she also advised that he needed medical intervention beyond what the facility could provide.  Ms. Bottino also provided the names and contact information for his treating physicians.

39.     On May 12, 2021, at 3:25 p.m., Ruth Hinkley, RN (hereinafter "Nurse Hinkley") noted that "Medical intake was tried this shift.  Per security chief, custody will not be bringing [Mr. Hall] to medical for intake due to his uncooperative and unwillingness to wear a safety smock."  Defendant Wise was the security chief that would not allow Mr. Hall to go to medical for a medical intake.

40.     The following day, on May 13, 2021, at almost 4:00 p.m., Erika Drayton, LCSWC (hereinafter "Social Worker Drayton") noted that she checked on Mr. Hall, and he was lying naked on the blanket in front of his cell door.  He was talking loudly to himself.

41.     That same day, Ms. Bottino was able to contact Officer Delph, who told her that she agreed that Mr. Hall "did not belong in jail," but that the reason why she had arrested Mr.

11

Hall and not taken him to the emergency room was because she had been talking to Hall for "over an hour and calls were piling up."

42.     The following day, on May 14, 2021, Mr. Hall had a video competency evaluation with Dr. Ojevwe via telemedicine from cell side with a webcam at the door's window. Dr. Ojevwe noted that Mr. Hall was lying naked on his bunk, talking unintelligibly, and most of his utterances were "garbled."  It was also noted, based on information provided by HCDC employees, that Mr. Hall was not sleeping, he was hallucinating, he talked almost non-stop, called the guards "mother" or "father," and that he was not eating.

42.     That same day around 5:00 p.m., Dr. Jou did a cell side assessment of Mr. Hall. She noted that Mr. Hall had not been sleeping, was talking to himself, talking "nonsensically," and that he would not wear any clothes.  Dr. Jou noted that Mr. Hall, when asked about the medications that he was taking (if any), responded in a manner that made no sense.  Dr. Jou then diagnosed Mr. Hall with bipolar disorder, manic with psychotic features and prescribed 500 mg of Depakote and 5 mg of Zyprexa, to be taken twice per day.

43.     On May 17, Monday, almost ten days after Mr. Hall was arrested, Milan K. Joshi, M.D., who had been treating Mr. Hall for over 20 years, contacted HCDC.  He faxed a letter that identified Mr. Hall's prescriptions (which included Ambien, Seroquel, Zoloft, and Wellbutrin). Dr. Joshi noted that he had been treating Mr. Hall for two decades, and during that entire time, he had known Mr. Hall to be "kind, decent, stable, compliant, and cooperative."  Dr. Joshi also noted that during those twenty years, Mr. Hall had "never had any psychotic episodes."  Dr. Joshi continued that the "bizarre behavior" that Mr. Hall was exhibiting at HCDC was "totally out of character and personality for him," and that Mr. Hall needed to be "neurologically carefully worked up, since this is entirely an out of character behavior for him."  Dr. Joshi also

provided his contact information.  But no one ever contacted Dr. Joshi, and a neurological

workup was never done, despite Dr. Joshi's recommendations.

44.     Despite this information, and despite Ms. Bottino providing the names of Mr.

Hall's healthcare providers, no one reached out to Dr. Joshi or to any of Mr. Hall's other

providers to request medical records or any additional information.

45.     The following morning, on May 18, 2021, Defendant Patterson, one of the HCDC

correctional officers that was overseeing Mr. Hall, expressed concern that Mr. Hall had refused

to eat "for many days," taking a bite of whatever was offered and then spitting the rest out.

Between his arrest and that day, the most that Mr. Hall had eaten was "a spoonful for oatmeal"

that morning and he had thrown the rest down the toilet and on the floor.

46.     Brooke Hoopengardner, RN (hereinafter "Nurse Hoopengardner") also noted that

Mr. Hall had refused "receiving screening," and was refusing "most food and liquids, consuming

very little nutrition."  Mr. Hall had visibly lost weight and was "shakier."   That same day, Nurse

Hoopengardner attempted to perform a skin test, but Mr. Hall refused.

47.     Between the time of his arrest and this date, May 18, 2021, Mr. Hall had lost so

much weight that he was prescribed Ensure; however, Mr. Hall either refused what was given to

him or it was not available.  By now, Mr. Hall had not eaten anything of substance since the

night prior to his arrest, which was May 6, 2021, 14 days before his death.  When Mr. Hall was

arrested on May 6, 2021, he weighed 175 pounds.  At the time of his death, on May 20, 2021,

Mr. Hall only weighed 160 pounds.

48.     Around 2:30 a.m. on the morning of the May 19, 2021, Mr. Hall "presented with

[a] bruised left ankle due to kicking and [that it] was turning purplish."  Nurse Rice authorized a

"one time dose of [ibuprofen] 800 mg po and 600 [ibuprofen] prn for 4 days" even though Mr.

Hall had not eaten anything of substance for almost two weeks. That same day, a little before 3:00 p.m., Dr. Wilson attempted to complete a physical examination on Mr. Hall, which he noted as an "Initial Annual Health Assessment."

49.     Dr. Wilson noted that Mr. Hall had swelling and discoloration to his left foot, and when he asked Mr. Hall about what happened, Mr. Hall became "upset." It had been noted by HCDC employees that he had become increasingly agitated and would kick the walls of his cell. At that time, Mr. Hall could not stand for the examination and had to be placed in a wheelchair to be examined. Dr. Wilson noted that Mr. Hall had elevated blood pressure with "foot pain," and that he was still speaking in "illogical speech." It was also noted that Mr. Hall was, at times, eating out of the toilet, playing with his feces, and "pouring drinks over his head." Dr. Wilson prescribed ibuprofen, an x-ray of the left foot, and blood pressure checks.

50.     In the early morning hours of May 20, 2021, almost a full two weeks after he was arrested, Mr. Hall asked officers to be taken out of the unit to sit in the hallway because he is not feeling comfortable and felt like he was "going to die." This complaint was met with the recommendation that Mr. Hall take his ibuprofen and divalproex sodium, which he did.

51.     Several hours later, Defendant Jenkins noted that Mr. Hall waved to her, mumbled something to her, and when asked how he was doing, he responded that he was "not so good."

52.     About two hours later, Defendant Tubaya was conducting a round, when she noticed that Mr. Hall was on the floor of his cell, "seemingly unconscious." She called out his name, but he did not respond; she opened the door to Mr. Hall's cell, but he remained unresponsive. Mr. Hall was moved from underneath the sink where he was located, but he had

no pulse.  The officers started CPR and summoned emergency services.  Nurse Hoopengardner arrived and administered Narcan "with no effect."  Emergency services arrived shortly thereafter.

53.    Mr. Hall was declared deceased within 10 minutes after he was first found unresponsive.

54.    As a result of the death, officers with HCDC were interviewed by Detective Ambrose with the Howard County Police Department within hours after Mr. Hall was declared deceased.  All of the officers interviewed commented on Mr. Hall's mental state, bizarre behavior, his lack of appetite, his refusal to take his medications, and his lack of sleep.

55.    When reviewing the surveillance video of Mr. Hall's cell from the morning that he died, loose skin can be seen on his thighs from the amount of weight that he lost during the time he was at HCDC.

56.    An autopsy was conducted, during which the Medical Examiner noted that Mr. Hall had multiple contusions on his body.  Mr. Hall suffered from multiple "brown to red to purple contusions" on the right wrist, the palms of both of his hands, left arm, right hip and knee, and his left leg, foot, and big toe.  Red abrasions were also noted on the right forearm, thigh, and leg.  An electrolyte test also revealed that Mr. Hall was severely dehydrated.  The neuropathology report notes that there was a "fresh" "focal subarachnoid hemorrhage of the left frontal pole," which indicates that Mr. Hall had suffered from trauma to the head.

57.    Ultimately, the Office of the Medical Examiner concluded that Mr. Hall died as a result of peritonitis, which was "due to a perforated duodenal ulcer."

58.    Defendants Wise, Jenkins, Tubaya, Patterson, Penn, Wilson, and Wright all had day-to-day, direct interaction with Mr. Hall throughout the almost two weeks that Mr. Hall was at HCDC.  Each of these Defendants were involved in the day-to-day supervision of Mr. Hall.

59.    Defendant Wise was the Security Chief at HCDC during this time.  As Security Chief, Defendant Wise was fourth in command in the DOC.  Defendant Wise, among other things, was responsible for supervising the shift Captains at HCDC and was in charge of maintaining the custody of all inmates at HCDC.  On at least two different days—May 11, 2021 and May 12, 2021—Defendant Wise refused to allow Mr. Hall to go to medical for a medical intake screening that is required[1] for all incarcerated individuals upon entry to a detention center in Maryland when medical staff attempted to conduct Mr. Hall's the screening, and, in fact, Mr. Hall was never allowed to go to medical for an initial medical intake screening.  It was not until May 19, 2021 that this initial medical intake screening was actually allowed to take place in Mr. Hall's cell.  This screening, however, was not very thorough.

60.    Defendant Jenkins was a Lieutenant that was assigned as the CBF Supervisor that oversaw the CBF of HCDC for the 8:00 am to 4:00 pm shift during the relevant time period.  Defendant Jenkins also worked the overnight shift at times during the relevant time period.  Defendant Jenkins had day-to-day interactions with Mr. Hall and acknowledged that from the first day he was there, Mr. Hall had severe mental issues.  Defendant Jenkins spoke with Ms. Bottino and knew that Mr. Hall's mental issues were not normal for him and that something out of the ordinary was wrong with him.  Defendant Jenkins knew that Mr. Hall was not eating, drinking, or sleeping.  Defendant Jenkins witnessed him fall because he was so unstable from being weak from not eating during his fourteen days at HCDC.  Defendant Jenkins acknowledges that Mr. Hall was never combative.  Defendant Jenkins was on duty in the CBF on the morning that Mr. Hall died.  Defendant Jenkins entered the CBF at approximately 7:45 am on

---

[1] Pursuant to Maryland Commission on Correctional Standards, Adult Detention Centers are required to have a procedure which provides a health screening of an inmate be conducted within 24 hours after admission to the detention center.

the morning of May 20, 2021, at which time she looked into Mr. Hall's cell and asked him how he was doing. Mr. Hall responded that he was "not doing so good." Defendant Jenkins acknowledged at that time that Mr. Hall was deteriorating and needed to go to the hospital. However, instead of calling emergency services right then and there so that Mr. Hall could receive the medical care that he desperately needed, Defendant Jenkins went to speak to Defendant King-Wessels about how bad Mr. Hall was. And in fact, Defendant Jenkins never called emergency services for Mr. Hall until after she returned to her office at approximately 9:15 am and Defendant Tubaya discovered Mr. Hall lying in his cell unresponsive with no pulse. For fourteen (14) days, Defendant Jenkins saw Mr. Hall almost every day and watched as Mr. Hall deteriorated to the point of death, and she did absolutely nothing to get Mr. Hall the medical care that he so desperately needed.

61.    Defendant Tubaya was an Officer that was assigned to the CBF of HCDC during the relevant time period. Defendant Tubaya was aware that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, was talking to himself, would not keep any clothes on, was incompetent, and that he had some severe mental health issues going on during the entirety of his time at HCDC. Defendant Tubaya had also observed bruises on Mr. Hall's back and that his butt had been red for a couple days before he died. For much of Mr. Hall's time at HCDC, HCDC employees were doing fifteen (15) minute CBF observation checks on him, even though it was only required to do thirty (30) minute checks on him. Defendant Tubaya was one of the officers that made CBF observations of Mr. Hall during Mr. Hall's time at HCDC. Defendant Tubaya is the HCDC employee that found Mr. Hall lying on his back on the cell floor unresponsive during a CBF observation check. Approximately thirty-two (32) minutes before discovering Mr. Hall unresponsive, Defendant Tubaya did a CBF

observation check on him and noticed that his hands seemed a little red, which was something new.  Despite this observation, as well as all of the other factors that she was aware of, Defendant Tubaya failed to call emergency services for Mr. Hall.  For fourteen (14) days, Defendant Tubaya saw Mr. Hall almost every day and watched as Mr. Hall deteriorated to the point of death, and she did absolutely nothing to get Mr. Hall the medical care that he so desperately needed.

62.    Defendant Penn was a Corporal that was assigned as the Officer in Charge (hereinafter "OIC") in the CBF of HCDC for during the relevant time period.  As the OIC, Defendant Wise approved for Defendant Penn to be assigned as the Lead Supervisor in the CBF.  As such, Defendant Penn was responsible for daily operations and the actions of officers that were assigned to the CBF during the relevant time period.  Defendant Penn was one of the officers that made CBF observations of Mr. Hall during Mr. Hall's time at HCDC.  In fact, Defendant Penn was the last HCDC employee to see Mr. Hall before Defendant Tubaya found Mr. Hall unresponsive.  Defendant Penn did a CBF observation of Mr. Hall at approximately 9:01 am and claims that Mr. Hall was lying on his back on the cell floor with his eyes closed.  Approximately sixteen (16) minutes later, Defendant Tubaya found Mr. Hall lying on his back on the cell floor unresponsive.  For fourteen (14) days, Defendant Penn saw Mr. Hall almost every day and watched as Mr. Hall deteriorated to the point of death, and he did absolutely nothing to get Mr. Hall the medical care that he so desperately needed.  Defendant Penn was well aware, among other things, that Mr. Hall had severe mental health issues; that Mr. Hall would not eat or drink anything; and that Mr. Hall should have never been at HCDC in the first place because of Mr. Hall's condition.  Defendant Penn acknowledges that Mr. Hall was never combative.

63.     Defendant Wilson was a Captain and the 8:00 am to 4:00 pm Shift Leader in the CBF of HCDC during the relevant time period.  As the Shift Leader, Defendant Wilson was the highest-ranking Security Supervisor on duty.  As part of her duties, Defendant Wilson was tasked with directly supervising HCDC staff.  Defendant Wilson was aware that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, was talking to himself, would not keep any clothes on, and that he had some severe mental health issues going on during the entirety of his time at HCDC.  Defendant Wilson failed to properly supervise the Defendant Officers that were involved with the supervision of Mr. Hall.  Had Defendant Wilson properly supervised the Defendant Officers, Defendant Officers would have gotten Mr. Hall to the hospital and Mr. Hall would have received the medical care that he so desperately needed.

64.     Defendant Wright was an Officer that was assigned to the CBF of HCDC during the relevant time period.  Defendant Wright was aware that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, was talking to himself, would not keep any clothes on, was incompetent, and that he had some severe mental health issues going on during the entirety of his time at HCDC.  Defendant Wright was one of the officers that made CBF observations of Mr. Hall during Mr. Hall's time at HCDC.  For fourteen (14) days, Defendant Wright saw Mr. Hall almost every day and watched as Mr. Hall deteriorated to the point of death, and he did absolutely nothing to get Mr. Hall the medical care that he so desperately needed.

65.     Defendants Wise, Jenkins, Tubaya, Patterson, Penn, Wilson, and Wright watched first-hand each day as Mr. Hall's already deteriorated state upon entry to HCDC continued to

deteriorate to the point of death and they did not do anything about it. They were deliberately indifferent to Mr. Hall's medical well-being.

66.     Defendants Acuff and King-Wessels were getting regular reports from HCDC employees regarding Mr. Hall's health and well-being. They were both well aware that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, and that he had some severe mental issues going on during the entirety of his time at HCDC. Defendant King-Wessels spoke with Ms. Bottino on multiple occasions when Ms. Bottino was calling HCDC trying to get HCDC to provide Mr. Hall with the medical care that he needed. When Mr. Hall died, Defendant Acuff emailed Defendant Wise to notify him of what happened:

> Just to let you know, Richard Hall died this morning at 9:15. He is the one in
> Booking who has been decompensating.

Defendant Wise's response to Defendant Acuff was:

> Dam it, I had feeling about him but didn't know what. Knew something was
> wrong about him but couldn't put my finger on it. This is two deaths in 30 days.
> But for him he should have never been brought to jail as opposed to being taken
> to the mental health to a hospital to where he could get the right kind of help.

They were both well aware that Mr. Hall had serious medical needs and, yet, they did nothing to provide him with adequate medical care. They should have sent Mr. Hall to the hospital within the first couple of days that Mr. Hall was at HCDC. Defendant King-Wessels expressed to Defendant Jenkins on at least one occasion before Mr. Hall died that she thought Mr. Hall needed to be transported to the hospital and, yet, she never did anything to make this happen.

67.     Mr. Hall had serious medical needs. The mental and physical problems that Mr. Hall had while he was at HCDC were so obvious that all of the Defendants easily recognized that Mr. Hall needed medical attention.

68.    All of the Defendants were deliberately indifferent to Mr. Hall's serious medical need.  All of the Defendants were aware that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, was talking to himself, would not keep any clothes on, and that he had some severe mental health issues going on during the entirety of his time at HCDC.  All of the Defendants knew that Mr. Hall's sister, Ms. Bottino, was calling HCDC and informing them that this was not normal behavior for Mr. Hall.  All of the Defendants knew that Mr. Hall's condition was deteriorating—instead of getting better.  All of the Defendants knew that Mr. Hall was not competent and that he could not advocate for himself.  All of the Defendants knew that Mr. Hall needed medical intervention, and yet, no one did anything to provide it to him—Defendants did not take him to the hospital or call for emergency services to come get him.  Defendant Wise would not let Mr. Hall go to medical—not even for an initial medical intake screening that is required by state law for all incarcerated individuals.  Defendants recognized that Mr. Hall's serious medical needs created such an obvious risk that they voluntarily did fifteen (15) minute CBF observation checks on Mr. Hall instead of the thirty (30) minute CBF observation checks that had been assigned for Mr. Hall.

69.    As a direct and proximate result of the Defendants' deliberate indifference to Mr. Hall's serious medical needs, Mr. Hall died in his cell, alone and naked on the floor.  Mr. Hall suffered significant physical pain and suffering over the course of fourteen (14) long, excruciating days, including, but not limited to, a severe infection from a perforated duodenal ulcer that festered and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.  Had Defendants' gotten Mr. Hall to the hospital so that he could receive the medical attention that he so desperately needed, it is more likely than not that Mr. Hall's death would have been prevented.

70.     Defendants were responsible for the care and safekeeping of Mr. Hall while he was under their control.

71.     All injuries, losses and damages to Plaintiff were caused solely by the conduct, actions, and inactions of Defendants, as set forth herein, without any negligence, want of due care, or provocation on the part of Plaintiff, either directly or indirectly.

72.     Mr. Hall did not cause or contribute to his injuries or the willful inaction of Defendants.

73.     Upon entering HCDC, Mr. Hall was given totally inadequate medical care, i.e., he was never properly evaluated upon entry to HCDC, and he was never taken to the hospital to address his obvious and serious medical concerns.  Defendants had a duty to provide Mr. Hall with adequate medical care.  Defendants knew that Mr. Hall was not eating, was not drinking, was visibly losing weight, was not sleeping, was hallucinating, was talking to himself, would not keep any clothes on, was incompetent, and that he had some severe mental health issues going on during the entirety of his time at HCDC.  Mr. Hall should have been properly evaluated upon entry to HCDC and should have been taken to the hospital so that he could receive adequate medical care.  Instead, Defendants stood by and watched Mr. Hall, putting eyes on him every fifteen (15) minutes for fourteen (14) days straight, as he visibly deteriorated and died and did absolutely nothing about it.  Defendants failed Mr. Hall and he paid the ultimate price as a result.

74.     All the allegations herein, however worded, are pleaded alternatively as acts of negligence, gross negligence, intent, and/or malice, as determined at trial by the jury in this matter.

**COUNT I**
**CIVIL RIGHTS ACT [42 U.S.C. § 1983] CONDITIONS OF CONFINEMENT**
**DENIAL OF ADEQUATE MEDICAL CARE**
**Fourth, Eighth, & Fourteenth Amendments**

**(Against All Defendants)**

75.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

76.    Defendants engaged in an activity that violated Mr. Hall's rights as protected under the Constitution of the United States, including, but not limited to, Mr. Hall's rights to personal security and protection under the Fourth, Eighth, and Fourteenth Amendments.

77.    Mr. Hall was at all times a pre-trial detainee at HCDC and was, therefore, owed the protections of due process of law pursuant to the Fourteenth Amendment to the U.S. Constitution.  Detainees and inmates are constitutionally entitled to detention in an environment that offers reasonable protection from harm.  Under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution Defendant County owed a duty of care to Mr. Hall to provide him with needed medical care in accordance with the standards of delivery of such care in the State of Maryland; institute and enforce policies that would maintain his well-being while in the custody of Defendant County; and adequately monitor him.  By the actions detailed herein, Defendants deprived Mr. Hall of his Constitutional rights under the Fourth, Eighth, and Fourteenth Amendments, including, but not limited to:

        a.    freedom from the abuse of power by law enforcement and correctional officers;

        b.    freedom from summary punishment;

        c.    freedom from cruel and unusual punishment; and

        d.    freedom from prison officials' and employees' deliberate indifference and/or unreasonableness to the health and safety of inmates.

78.    These rights were denied to Mr. Hall when Defendants knowingly allowed or failed to intervene when they were on actual notice that Mr. Hall had serious medical needs, and Mr. Hall was not properly evaluated upon entry to HCDC and was never taken to the hospital so that he could receive adequate medical care that he so desperately needed without legal cause, excuse, or justification.

79.    At all relevant times, Defendants had actual knowledge that Mr. Hall:

      a.    was not eating;

      b.    was not drinking;

      c.    was visibly losing weight;

      d.    was not sleeping;

      e.    was hallucinating;

      f.    was talking to himself;

      g.    would not keep any clothes on;

      h.    was incompetent; and

      i.    had some severe mental health issues going on during the entirety of his time at HCDC; and

      j.    Defendants also had actual knowledge that none of this was normal for Mr. Hall—both Mr. Hall's sister, Ms. Bottino, and his doctor, Milan Joshi, M.D., informed Defendants of that fact.

80.    At all relevant times, Defendants knew that each of the facts listed in the previous paragraph are clear indicators of an obvious and excessive risk to a detainee's health.

81.    Defendants were, therefore, acutely aware of an excessive risk to Mr. Hall's health.

82.     Although it is required that all individuals incarcerated within a detention center, such as HCDC, receive a health screening within 24 hours of admission to the facility, Mr. Hall never received such a health screening upon entry to HCDC.  Defendant Wise refused to let Mr. Hall go to medical for this screening on more than one occasion.  Instead, Defendants watched for almost two full weeks as Mr. Hall lied on the cold floor of his cell, naked, incompetent, talking to himself, not eating, not drinking, visibly losing weight, not sleeping, and hallucinating—Defendants literally watched Mr. Hall deteriorate to the point that he actually died—and they did absolutely nothing about it.  Mr. Hall should have been medically assessed and taken to the hospital so that he could receive adequate medical care for the Peritonitis he had from a perforated Duodenal Ulcer.

83.     Defendants acted with deliberate indifference and/or unreasonableness to Mr. Hall's established rights when they failed to perform a health screening within 24 hours of Mr. Hall's admission to the facility.  Defendants also acted with deliberate indifference and/or unreasonableness to Mr. Hall's established rights when they failed to take him to the hospital so that he could receive adequate medical care for the Peritonitis he had from a perforated Duodenal Ulcer.

84.     Had Defendants actually performed a health screening within 24 hours of his admission to the facility, it is more likely than not that Defendants would have sent Mr. Hall to the hospital for adequate medical care and prevented Mr. Hall's death from occurring.

85.      Had Defendants reasonably responded to the obvious health issues that they knew Mr. Hall was having—and that were only getting worse over time—and gotten Mr. Hall to a hospital, Mr. Hall's death would have been prevented.

86.     As a direct and proximate result of the Defendants' actions, Mr. Hall suffered

significant physical pain and suffering over the course of fourteen (14) long, excruciating days,

including, but not limited to, a severe infection from a perforated duodenal ulcer that festered

and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be

determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and

punitive damages, in an amount to be determined at trial, and such other and further relief as the

nature of the case requires including, but not limited to, declaratory and injunctive relief

declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and

enjoining future unlawful and unconstitutional misconduct of the same type.

**COUNT II**
**MARYLAND DECLARATION OF RIGHTS CONDITIONS OF CONFINEMENT –**
**DENIAL OF ADEQUATE MEDICAL CARE**
**Articles 16, 19, 24, 25, and 26**
**(Against All Defendants)**

87.     Plaintiff adopts and incorporates by reference each and every allegation contained

elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

88.     Defendants engaged in an activity that violated Mr. Hall's rights as protected

under the Maryland Declaration of Rights, including, but not limited to, Mr. Hall's rights to

personal security and protection under Articles 16, 19, 24, 25, and 26.

89.     Mr. Hall was at all times a pre-trial detainee at HCDC and was, therefore, owed

the protections of due process of law pursuant to Articles 16, 19, 24, 25, and 26 of the Maryland

Declaration of Rights.  Detainees and inmates are constitutionally entitled to detention in an

environment that offers reasonable protection from harm.  Under the Articles 16, 19, 24, 25, and

26, Defendant County owed a duty of care to Mr. Hall to provide him with needed medical care

26

in accordance with the standards of delivery of such care in the State of Maryland; institute and enforce policies that would maintain his well-being while in the custody of Defendant County; and adequately monitor him.  By the actions detailed herein, Defendants deprived Mr. Hall of his rights under Articles 16, 19, 24, 25, and 26, including, but not limited to:

      a.      freedom from the abuse of power by law enforcement and correctional officers;

      b.      freedom from summary punishment;

      c.      freedom from cruel and unusual punishment; and

      d.      freedom from prison officials' and employees' deliberate indifference and/or unreasonableness to the health and safety of inmates.

90.      These rights were denied to Mr. Hall when Defendants knowingly allowed or failed to intervene when they were on actual notice that Mr. Hall had serious medical needs, and Mr. Hall was not properly evaluated upon entry to HCDC and was never taken to the hospital so that he could receive adequate medical care that he so desperately needed without legal cause, excuse, or justification.

91.      At all relevant times, Defendants had actual knowledge that Mr. Hall:

      a.      was not eating;

      b.      was not drinking;

      c.      was visibly losing weight;

      d.      was not sleeping;

      e.      was hallucinating;

      f.      was talking to himself;

      g.      would not keep any clothes on;

      h.     was incompetent; and

      i.     had some severe mental health issues going on during the entirety of his

time at HCDC; and

      j.     Defendants also had actual knowledge that none of this was normal for

Mr. Hall—both Mr. Hall's sister, Ms. Bottino, and his doctor, Milan Joshi, M.D.,

informed Defendants of that fact.

92.     At all relevant times, Defendants knew that each of the facts listed in the previous

paragraph are clear indicators of an obvious and excessive risk to a detainee's health.

93.     Defendants were, therefore, acutely aware of an excessive risk to Mr. Hall's

health.

94.     Although it is required that all individuals incarcerated within a detention center,

such as HCDC, receive a health screening within 24 hours of admission to the facility, Mr. Hall

never received such a health screening upon entry to HCDC.  Defendant Wise refused to let Mr.

Hall go to medical for this screening on more than one occasion.  Instead, Defendants watched

for almost two full weeks as Mr. Hall was lying on the cold floor of his cell, naked, incompetent,

talking to himself, not eating, not drinking, visibly losing weight, not sleeping, and

hallucinating—Defendants literally watched Mr. Hall deteriorate to the point that he actually

died—and they did absolutely nothing about it.  Mr. Hall should have been medically assessed

and taken to the hospital so that he could receive adequate medical care for the Peritonitis he had

from a perforated Duodenal Ulcer.

95.     Defendants acted with deliberate indifference and/or unreasonableness to Mr.

Hall's established rights when they failed to perform a health screening within 24 hours of Mr.

Hall's admission to the facility.  Defendants also acted with deliberate indifference and/or

unreasonableness to Mr. Hall's established rights when they failed to take him to the hospital so that he could receive adequate medical care for the Peritonitis he had from a perforated Duodenal Ulcer.

96.     Had Defendants actually performed a health screening within 24 hours of his admission to the facility, it is more likely than not that Defendants would have sent Mr. Hall to the hospital for adequate medical care and prevented Mr. Hall's death from occurring.

97.      Had Defendants reasonably responded to the obvious health issues that they knew Mr. Hall was having—and that were only getting worse over time—and gotten Mr. Hall to a hospital, Mr. Hall's death would have been prevented.

98.     As a direct and proximate result of the Defendants' actions, Mr. Hall suffered significant physical pain and suffering over the course of fourteen (14) long, excruciating days, including, but not limited to, a severe infection from a perforated duodenal ulcer that festered and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT III
### Negligence
### (Against all Defendants)

99.     Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

100.     Defendants had a duty to provide care, safekeeping, and protection, and, *inter alia*, not create or maintain a dangerous condition which could harm persons such as Mr. Hall, who were under their control.

101.     Defendants had a special duty to Mr. Hall because of the custodial relationship between Defendants and Mr. Hall, and because Defendants put Mr. Hall in harm's way by placing him in a zone of danger.

102.     Defendants breached their duty of reasonable care under the circumstances when Defendants knowingly allowed or failed to intervene when they were on actual notice that Mr. Hall had serious medical needs, and Mr. Hall was not properly evaluated upon entry to HCDC and was never taken to the hospital so that he could receive adequate medical care that he so desperately needed without legal cause, excuse, or justification.

103.     At all relevant times, Defendants had actual knowledge that Mr. Hall:

    a.     was not eating;

    b.     was not drinking;

    c.     was visibly losing weight;

    d.     was not sleeping;

    e.     was hallucinating;

    f.     was talking to himself;

    g.     would not keep any clothes on;

    h.     was incompetent; and

    i.     had some severe mental health issues going on during the entirety of his time at HCDC; and

j.     Defendants also had actual knowledge that none of this was normal for Mr. Hall—both Mr. Hall's sister, Ms. Bottino, and his doctor, Milan Joshi, M.D. informed Defendants of that fact.

104.    At all relevant times, Defendants knew that each of the facts listed in the previous paragraph are clear indicators of an obvious and excessive risk to a detainee's health.

105.    Defendants were, therefore, acutely aware of an excessive risk to Mr. Hall's health.

106.    Defendants breached their duty of reasonable care when they failed to perform a health screening within 24 hours of Mr. Hall's admission to the facility or at any time during his incarceration.

107.    Defendants breached their duty of reasonable care when they actually and proximately caused Mr. Hall to suffer severe and ultimately fatal physical injuries.

108.    Had Defendants actually performed a health screening within 24 hours of his admission to the facility, or at any time during his incarceration, it is more likely than not that Defendants would have sent Mr. Hall to the hospital for adequate medical care and prevented Mr. Hall's death from occurring.  Had Defendants reasonably responded to the obvious health issues that they knew Mr. Hall was having—and that were only getting worse over time—and gotten Mr. Hall to a hospital, Mr. Hall's death would have been prevented.

109.    As a direct and proximate result of the Defendants' actions, Mr. Hall suffered significant physical pain and suffering over the course of fourteen (14) long, excruciating days, including, but not limited to, a severe infection from a perforated duodenal ulcer that festered and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

**<u>COUNT IV</u>**
**Gross Negligence**
**(Against all Defendants)**

110.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

111.    Defendants acted recklessly with gross negligence and/or malice when Mr. Hall, under their watch and care, was suffering from an obvious and serious medical need and was allowed to lie on the cold floor of his cell, for almost two weeks, without adequate medical care, resulting in his untimely death.  Defendants knowingly allowed or failed to intervene when Defendants were on actual notice that Mr. Hall:

  a.    was not eating;

  b.    was not drinking;

  c.    was visibly losing weight;

  d.    was not sleeping;

  e.    was hallucinating;

  f.    was talking to himself;

  g.    would not keep any clothes on;

  h.    was incompetent; and

        i.      had some severe mental health issues going on during the entirety of his time at HCDC; and

        j.      Defendants also had actual knowledge that none of this was normal for Mr. Hall—both Mr. Hall's sister, Ms. Bottino, and his doctor, Milan Joshi, M.D., informed Defendants of that fact.

Defendants literally watched Mr. Hall deteriorate to the point that he actually died, and they did absolutely nothing to even try to get him adequate medical care.

112. At all relevant times, Defendants knew that each of the facts listed in the previous paragraph are clear indicators of an obvious and excessive risk to a detainee's health.

113. Defendants were, therefore, acutely aware of an excessive risk to Mr. Hall's health.

114. Because Mr. Hall was, for almost two weeks, lying on the cold floor of his cell, naked, incompetent, talking to himself, not eating, not drinking, visibly losing weight, not sleeping, and hallucinating, proper medical care and supervision was of the essence.

115. Defendants acted with gross negligence and/or malice by intentionally and knowingly failing to provide Mr. Hall proper medical care, proper supervision, and proper safety precautions.

116. Defendants acted with gross negligence and malice when they intentionally failed to provide Mr. Hall safety and security from a serious and obvious medical need by encouraging or failing to intervene by way of providing him with adequate medical care.

117. By knowingly allowing Mr. Hall's serious medical needs to go unaddressed and allowing his death to occur and by failing to provide proper medical care, proper supervision,

and proper safety precautions, Defendants were acting with wanton and willful disregard of Mr. Hall's rights as if such rights did not exist.

118.    In the alternative, Defendants acted with malice when they purposefully allowed Mr. Hall's serious medical needs to go unaddressed and allowed his death to occur.

119.    Defendants demonstrated ill-will and an evil and wrongful motive against Mr. Hall when they allowed Mr. Hall's serious medical needs to go unaddressed and allowed his death to occur.

120.    By allowing Mr. Hall's serious medical needs to go unaddressed and allowed his death to occur, Defendants demonstrated a purpose to deliberately and willfully and unreasonably injure Mr. Hall.

121.    As a direct and proximate result of the Defendants' actions, Mr. Hall suffered significant physical pain and suffering over the course of fourteen (14) long, excruciating days, including, but not limited to, a severe infection from a perforated duodenal ulcer that festered and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT V
### Survivorship
### (Against all Defendants)

122.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

123.    Dianne Bottino is the Representative of the Estate of Richard Hall.

124.    Defendants owed a duty to exercise due care for the safety and security of those under correctional control, particularly Mr. Hall, and failed in their exercise of that care which caused or contributed to his tragic and untimely death.

125.    Defendants were on actual notice that Mr. Hall had serious medical needs, and Mr. Hall was not properly evaluated upon entry to HCDC and was never taken to the hospital so that he could receive adequate medical care that he so desperately needed without legal cause, excuse, or justification.

126.    At all relevant times, Defendants had actual knowledge that Mr. Hall:

    a.      was not eating;

    b.      was not drinking;

    c.      was visibly losing weight;

    d.      was not sleeping;

    e.      was hallucinating;

    f.      was talking to himself;

    g.      would not keep any clothes on;

    h.      was incompetent; and

    i.      had some severe mental health issues going on during the entirety of his time at HCDC; and

j.    Defendants also had actual knowledge that none of this was normal for

Mr. Hall—both Mr. Hall's sister, Ms. Bottino, and his doctor, Milan Joshi, M.D.

informed Defendants of that fact.

127.    At all relevant times, Defendants knew that each of the facts listed in the previous

paragraph are clear indicators of an obvious and excessive risk to a detainee's health.

128.    Defendants were, therefore, acutely aware of an excessive risk to Mr. Hall's

health.

129.    Defendants breached their duty of reasonable care when they failed to perform a

health screening within 24 hours of his admission to the facility.  Defendants also breached their

duty of reasonable care when they failed to take him to the hospital so that he could receive

adequate medical care for the Peritonitis he had from a perforated Duodenal Ulcer.

130.    As a direct and proximate result of the Defendants' negligent breach of duties

owed to Mr. Hall, Mr. Hall suffered grievous injuries which resulted in a lengthy period of

continuous and conscious pain and suffering prior to his death on May 20, 2021.

131.    Plaintiff Bottino, as personal representative of Mr. Hall's estate, brings this action

pursuant to Md. Code Ann., Est. & Trusts §7-401 and is entitled to recover damages including,

but not limited to, health care expenses, funeral and burial expenses, and pain and suffering.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be

determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and

punitive damages, in an amount to be determined at trial, and such other and further relief as the

nature of the case requires including, but not limited to, declaratory and injunctive relief

declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and

enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT VI
## Negligent Supervision
### (Against Defendants County, Chippendale, Acuff, King-Wessels, Wise, and Wilson)

132.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth in this count.

133.    Defendants County, Chippendale, Acuff, King-Wessels, and Wise had a duty to use reasonable care to select employees who are competent and fit to perform the duties of an employee of HCDC.

134.    Individual officers and administrators herein were employees of Howard County at all times relevant hereto.

135.    Upon information and belief, individual officers, administrators, and other employees have previously committed violations such as those at issue here.

136.    Defendants had constructive and/or actual knowledge of individual employees' and other officers' previous violations.

137.    The prior transgressions of individual employees and other officers are such to put Defendants on notice that the individual employees are unfit for duty.

138.    The prior transgressions of individual employees are such to give rise to a duty to properly supervise individual employees.

139.    Despite having the duty and authority to properly supervise individual employees, Defendants negligently failed to properly supervise individual employees.

140.    As a direct and proximate result of the negligent supervision of individual employees as described herein, individual employees were put in a position to commit the wrongs in this case.

141.    Had Defendants exercised reasonable diligence and care, it would have been known that the individual employees were capable of inflicting this type of harm on Plaintiff.

142.    Defendants failed to use proper care in supervising individual employees, failed to create proper policies and procedures, failed to mandate compliance with the constitutional rights of people like the decedent, failed to enact and enforce policies which would have provided the decedent with the medical care he needed and would have saved his life.  This includes, but is not limited to, the failure to create and enforce policies requiring medical care for the Decedent under all of the circumstances of this case

143.    Defendants failed to supervise individual employees in a matter sufficient to ensure that they would not engage in unlawful, unconstitutional, or tortious conduct.

144.    Defendants knew or should have known that the supervision was inadequate to ensure that its individual employees do not engage in unlawful, unconstitutional, or tortious conduct.

145.    This negligent supervision has led to a pattern or practice of unlawful, unconstitutional, and tortious conduct on the part of Defendants.

146.    As a direct and proximate result of the Defendants' actions, Mr. Hall suffered significant physical pain and suffering over the course of fourteen (14) long, excruciating days, including, but not limited to, a severe infection from a perforated duodenal ulcer that festered and worsened over the course of time that Mr. Hall was at HCDC, and ultimately loss of life.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief

declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT VII
### 42 U.S.C. § 1983 – 4th Amendment *Monell* Claim
### (Against Defendant County)

147.    Plaintiff adopts and incorporates by reference each and every allegation contained in the foregoing paragraphs verbatim with the same effect as if herein fully set forth.

148.    Defendant County failed to adequately train, supervise, and discipline its officers against failing to provide adequate medical care.  The failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of the injuries to Mr. Hall.

149.    Defendant County has instituted and maintained formal and informal customs, policies, and practices that foster, promote and encourage officers to fail to provide adequate medical care to incarcerated individuals at HCDC.  Among those practices are the following:

    a.    Failure to provide adequate medical care to incarcerated individuals at
    HCDC occurs so frequently that it has become accepted manner by the
    Defendants and other employees of Defendant County.  This is a result of
    Defendant County's failure to establish effective procedures, rules, orders,
    guidelines, and practices to ensure that arrests will be supported by probable
    cause and to ensure that allegations to the contrary will be thoroughly investigated
    and appropriately punished when found to have occurred.  As a result of this
    failure, there has been a regular pattern and practice of failure to provide adequate
    medical care to incarcerated individuals at HCDC and failure to investigate. This

pattern and practice has been manifested in other prior incidents involving HCDC employees.

b.      Defendant County has failed to effectively instruct employees that they have a duty to prevent and report the failure to provide adequate medical care to incarcerated individuals at HCDC when it occurs. Defendant County has failed to enact and enforce policies and procedures sufficient to ensure medical care for people like the decedent.

c.      Defendant County has failed to keep accurate records as to the number of times employees have failed to provide adequate medical care to incarcerated individuals at HCDC. This policy encourages the failure to provide adequate medical care to incarcerated individuals at HCDC and inhibits Defendant County from critically evaluating the need for a change in training.

d.      Defendant County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of the failure of HCDC employees to provide adequate medical care to incarcerated individuals at HCDC.

150.    The policies and customs of Defendant County, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the Plaintiff. At the time of the injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures. These customs, policies, and procedures were a proximate cause of the injuries to Mr. Hall.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the

nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Respectfully submitted,

HANSEL LAW, P.C.

_/s/ Kristen Mack_____
Cary J. Hansel (Bar No.: 14722)
Kristen M. Mack (Bar No.: 30349)
2514 North Charles Street
Baltimore, Maryland 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
cary@hansellaw.com
kmack@hansellaw.com
*Counsel for Plaintiffs*